IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| JEREMY JOHN BRAULICK, | CV-17-00122-GF-JTJ |
| Plaintiff, | |
| vs. | ORDER |
| CORECIVIC (F/K/A CORRECTIONS CORPORATION OF AMERICA) and NURSE DIDIER, | |
| Defendants. | |

Pending before the Court is Defendants' Motion for Summary Judgment (Doc. 39.)  Plaintiff Jeremy Braulick, a pro se prisoner, filed a Complaint on November 3, 2017 alleging four counts against various named defendants. (Complaint, Doc. 2.)  The only remaining claims are Mr. Braulick's allegations raised in Counts III and IV of the Complaint against CoreCivic and Nurse Didier. CoreCivic and Nurse Didier filed an Answer to Counts III and IV on July 19, 2018 denying liability.  (Doc. 15.)

Having considered the parties' arguments and submission, Mr. Braulick has established a genuine dispute as to material facts regarding his retaliation claim alleged in Count III against Nurse Didier.  Nurse Didier's Motion for Summary

1

Judgment will be denied.  CoreCivic has established that there is no genuine issue of material fact regarding the merits of Mr. Braulick's *Monell* claims regarding his medications as alleged in Count IV of the Complaint.  CoreCivic's Motion for Summary Judgment will be granted.

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).

"Where the non-moving party bears the burden of proof at trial, the moving

party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.

*See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. "A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted).

By notice provided on March 4, 2019 (Doc. 43), Mr. Braulick was advised

of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998)(en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

## II. UNDISPUTED FACTS

### A. Blood Draws

Defendant Nurse Didier is a registered nurse ("R.N.") at the Crossroads Correctional Center ("Crossroads") located in Shelby, Montana. (SUF at ¶ 5.) Mr. Braulick was being monitored for thyroid concerns in the Crossroads' clinic and saw Nurse Didier for blood draws to determine his thyroid levels. (SUF at ¶ 6.) Mr. Braulick contends that Nurse Didier only drew his blood on three occasions. (SDF at ¶ 6.)

On February 5, 2015, Mr. Braulick submitted an informal resolution form complaining that on January 28, 2015 at 4:00 a.m., Nurse Didier did not wear gloves while conducting his blood draw. (SUF at ¶ 8; Informal Resolution Form, Doc. 2-1 at 42-43.) At that blood draw, Mr. Braulick made clear that he did not want Nurse Didier to touch him with her ungloved free hand. (SUF at ¶ 8.)

Nurse Didier contends she was not aware of the February 2, 2015 grievance submitted by Mr. Braulick until this lawsuit was filed. (SUF at ¶ 8.) Mr. Braulick contests this statement because the response to the February 5, 2015 grievance

states, "I will advise my law draw nurse on standard precautions when drawing labs." He argues that once Nurse Didier was advised about standard lab draw precautions by her supervisor she would have known it was Mr. Braulick who complained about her. In addition, Mr. Braulick testified that he made it clear to Nurse Didier at the time of the incident that he had an issue with her ungloved hands. (SDF at ¶ 8.)

On September 22, 2015, Nurse Didier conducted another blood draw on Mr. Braulick. (SUF at ¶ 10.) On that same day, Mr. Braulick submitted an informal resolution form in which he stated,

> Today at about 3:35 a.m. I had a labdraw and the nurse who took my blood got an attitude with me. She began by asking me if I put in my previous grievance about her "Did you put I wipe my fingers with the alcohol pad before touching your vein." I didn't answer her as I didn't like her tone. She proceeded to touch my vein with her bare finger before inserting the needle. I said, "no you need to put your gloves on before touching my vein." She got upset and put the glove on than proceeded to put the needle in when I stopped her and said, "she needed to rewipe my vein." She than ripped open an alcohol swab package and began aggressively and violently swabbing my arm and jabbed the needle in my arm and moved the needle to a cockeyed position to my vein causing it to tear my vein inside my arm and for it to bleed out inside my arm causing the area on my arm to discolor. While she was doing this she made the comment that "Next time you write a grievance you need to put in it that I wipe my fingers with the alcohol pad." and restated the comment as I left. . . .

(Informal Resolution Form, Doc. 2-1 at 44-45.)

With regard to this blood draw, Nurse Didier made a note on the lab requisition form stating, "Fasting lab specimen obtained in one attempt and without difficulty from LAC." (Doc. 42-1 at 2.) Nurse Didier does not recall anything unusual medically about that blood draw and nothing unusual is indicated in her contemporaneous records. Nurse Didier testified that she wore standard exam gloves on each hand on September 22, 2015. She cleaned Mr. Braulick's arm and felt the vein again to be sure of placement before inserting the needle. She testified that Mr. Braulick spoke harshly to her that she was not to touch his arm, even with her gloved hand, prior to inserting the needle. Nurse Didier pointed out to Mr. Braulick that she had gloves on and Mr. Braulick subsided, but appeared to remain angry. As he left the lab after the blood draw, Mr. Braulick stated that he was going to file a grievance. Nurse Didier asked him to include in any statement that she had used alcohol on her bare finger and then later on her gloved finger. Mr. Braulick did not complain of any pain or injury at that time and departed the lab. (SUF at ¶ 10 citing Didier Aff. at ¶ 9.)

Mr. Braulick contests these statements on the grounds that Nurse Didier did not make any negative notes about him from the September 22, 2015 blood draw. (SDF at ¶ 10.)

Mr. Braulick also submitted a Sick Call Request on September 22, 2015

stating that the nurse who did his blood draw caused "the needle to go through my vein and for me to bleed out in my arm and my arm to discolor." He received a response on September 24, 2015 advising that this "is a common complication w/drawing blood" and that he can apply warm packs to the site for comfort. (SUF at ¶ 11; Sick Call Request, Doc. 42-1 at 3.)

Nurse Didier was not made aware of any other complaints about the September 22, 2015 blood draw until this lawsuit was filed. (SUF at ¶ 12.)

A blood draw necessarily causes some pain as it requires a needle injected into the body. Nurse Didier testified that she has never intentionally caused increased pain beyond what a normal blood draw requires on any patient, including Mr. Braulick. While Mr. Braulick's left arm may have shown some discoloration after the September 22 blood draw, that is not unusual and is a very common side effect of the procedure. No bruising was noted or demonstrated on Mr. Braulick's subsequent visits to medical on September 28, September 29, or October 2, 2015. (SUF at ¶ 16.)

## B. Thyroid Medications

In Count IV of the Complaint, Mr. Braulick alleged that Crossroads' staff failed to give him his thyroid medications on three occasions in 2014 and that Crossroads' rules and policies kept him from getting needed medications. The

first incident occurred in June 2014 when Mr. Braulick tried to get his medication on a non-KOP ("keep on person") day. He alleges he took his last pill on Saturday morning and since Tuesday was the next KOP day, he had to go without his medication for two and a half days. He also alleges that on October 16, 2014 he was placed in "the hole" and did not get his medication on October 17 and 18, 2014. When he got out of the hole on October 31, 2014, he did not get his medication until mid-day November 3, 2014. (Complaint, Doc. 2 at 57-58.)

Mr. Braulick was advised regarding access to health care at the prison upon intake at Crossroads. This included a health care information sheet which addressed pill call and KOP medications. Mr. Braulick was also provided instructions related to his KOP medications and what he was required to do to re-order and obtain additional blister packs. (SUF at ¶ 19.) CoreCivic's Policy 13-70 addresses pharmaceuticals, including the dispensing of medications to inmates, and the KOP program. (SUF at ¶ 20.) Crossroads also has policies related to Mr. Braulick's hypothyroid condition and blood draws. (SUF at ¶ 21.) The policies and practices at Crossroads are to provide inmates, including Mr. Braulick, with his prescribed and approved medications. If an inmate has not re-ordered medications in a timely manner or supply cannot be located in the facility for any reason, there may be a missed dose, but those circumstances would

be highly unusual and not the policy, practice or custom at Crossroads.  (SUF at ¶ 22.)

## III.  DISCUSSION

### A.  Retaliation–Blood Draws

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements:  (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005)(*citing Resnick v. Hayes*, 213 F.3d 443, 449 (9th Cir. 2000)).  It is the plaintiff's burden to prove each of these elements.  *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995).

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so."  *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012); *see also Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) ("[A] retaliation claim may assert an injury no more tangible than a chilling effect on First Amendment rights.")

Taking the facts in the light most favorable to Mr. Braulick, the Court finds a genuine issue of material fact exists regarding whether Nurse Didier retaliated

against Mr. Braulick when she took his blood on September 22, 2015.

Under the first element of a viable First Amendment retaliation claim, a plaintiff need not prove that the alleged retaliatory action, in and of itself, violated a constitutional right. *Id.* (to prevail on a retaliation claim, plaintiff need not "establish an independent constitutional interest" was violated); *see also Hines v. Gomez*, 108 F.3d 265, 268 (9th Cir. 1997) (upholding jury determination of retaliation based on filing of a false rules violation report); *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985) (transfer of prisoner to a different prison constituted adverse action for purposes of retaliation claim). The interest cognizable in a retaliation claim is the right to be free of conditions that would not have been imposed but for the alleged retaliatory motive.

Mr. Braulick has established an issue of fact regarding whether Nurse Didier took an adverse action against him. He contends that Nurse Didier "violently jabbed the needle in my arm causing injury to my arm to the point I felt like she poked into or knicked the tendon in my arm due to the angled position to my vein she moved the needle to and the pain in my arm that lasted about 10 days." (Complaint, Doc. 2 at 55.) Nurse Didier does not recall anything unusual about the blood draw. She testified that a blood draw necessarily causes some pain and that she never intentionally caused increased pain beyond what a normal

11

blood draw requires on any patient. (Didier Affidavit, Doc. 42 at 3, 5, ¶¶ 9, 15.) Given the different versions of the blood draw itself, there is an issue of fact regarding whether Nurse Didier took adverse action against Mr. Braulick.

To prove the second element – retaliatory motive – a plaintiff must show that his protected activities were a "substantial" or "motivating" factor behind the defendant's challenged conduct. *Brodheim v. Cry*, 584 F.3d 1262, 1269, 1271 (9th Cir. 2009). A plaintiff must provide direct or circumstantial evidence of defendant's alleged retaliatory motive; mere speculation is not sufficient. *See McCollum v. CDCR*, 647 F.3d 870, 882–83 (9th Cir. 2011); *accord Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir. 2014). In addition to demonstrating defendant's knowledge of plaintiff's protected conduct, circumstantial evidence of motive may include: (1) proximity in time between the protected conduct and the alleged retaliation; (2) defendant's expressed opposition to the protected conduct; and (3) other evidence showing that defendant's reasons for the challenged action were false or pretextual. *McCollum*, 647 F.3d at 882.

The response to Mr. Braulick's February 5, 2015 grievance stated, "I will advise my law draw nurse on standard precautions when drawing labs." (Doc. 2-1 at 42.) Nurse Didier denies knowledge of this grievance but Mr. Braulick argues that once Nurse Didier was advised of the standard precautions on lab draws (as

indicated in the grievance response), she would have known that it was Mr. Braulick who complained about her because she admits that during the February blood draw Mr. Braulick "made clear that he did not want me to touch him with my ungloved free hand." (Didier Aff, Doc. 42 at 3, ¶ 7.). In addition, Mr. Braulick stated in his September 22, 2015 informal resolution form that Nurse Didier began the September 22 interaction by having an "attitude" with him for filing a grievance against her and told him what he should and should not say in his grievances. (Doc. 2 at 54, Doc. 2-1 at 44.) Mr. Braulick's testimony that Nurse Didier expressed opposition to his filing the prior grievance just prior to allegedly jabbing his arm in an intentionally painful manner creates a genuine issue of material fact regarding whether she took adverse action against him because of his protected conduct.

The third element concerns a prisoner's First Amendment right to access the courts. *Lewis v. Casey*, 518 U.S. 343, 346 (1996). While prisoners have no freestanding right to a prison grievance process, *see Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003), "a prisoner's fundamental right of access to the courts hinges on his ability to access the prison grievance system." *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995), *overruled on other grounds by Shaw v. Murphy*, 532 U.S. 223, 230 n.2 (2001). Because filing administrative grievances and

initiating civil litigation are protected activities, it is impermissible for prison officials to retaliate against prisoners for engaging in these activities. *Rhodes*, 408 F.3d at 567–68. Protected speech also includes an inmate's statement of intent to pursue an administrative grievance or civil litigation. *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012); *Rhodes*, 408 F.3d at 567; *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003). It is undisputed that Mr. Braulick filed a grievance regarding Nurse Didier on February 5, 2015 which constitutes protected conduct.

Under the fourth element, a plaintiff need not demonstrate a "total chilling of his First Amendment rights," only that defendant's challenged conduct "would chill or silence a person of ordinary firmness from future First Amendment activities." *Rhodes*, 408 F.3d at 568–69 (citation and internal quotation marks omitted). Moreover, direct and tangible harm will support a retaliation claim even without demonstration of a chilling effect on the further exercise of a prisoner's First Amendment rights. *Id*. at 568 n.11. "[A] plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm" as a retaliatory adverse action. *Brodheim*, 584 F.3d at 1269 (*citing Rhodes*, 408 F.3d at 568 n. 11).

Defendants argue that Mr. Braulick cannot prove that Nurse Didier's alleged conduct chilled or affected his willingness to file grievances because he

continued to use the grievance process regularly. (MSJ Brief, Doc. 41 at 12.) But the Ninth Circuit makes clear that "[s]peech can be chilled even when not completely silenced." *Rhodes*, 408 F.3d at 568. As set forth in *Rhodes*, "[b]ecause it would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity, Rhodes does not have to demonstrate that his speech was actually inhibited or suppressed." *Id.* at 569 (internal quotations and citations omitted.)

The Court finds that jabbing a needle into someone's arm causing pain for approximately ten days (as alleged by Mr. Braulick) would chill a person of ordinary firmness from future First Amendment activities. In addition, Mr. Braulick has alleged "direct and tangible harm" sufficient to support his retaliation claim without the demonstration of a chilling effect. *See Id*. at 568 n.11. Defendants argue that this requires that Mr. Braulick show more than minimal harm and Mr. Braulick failed to show more than minimal harm because his medical records only showed some discoloration of his arm. (MSJ Brief, Doc. 41 at 12.) Mr. Braulick contends that it felt like the needle poked into or knicked a tendon and that he suffered pain in his arm for approximately ten days. (Complaint, Doc. 2 at 55.) If believed, this could be considered more than

minimal harm. Mr. Braulick's allegations that his First Amendment rights were chilled, though not necessarily silenced, is enough to create a genuine issue of fact on this issue.

Regarding the fifth element, the Ninth Circuit has held that preserving institutional order, discipline, and security are legitimate penological goals that, if they provide the motivation for an official act taken, will defeat a claim of retaliation. *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994); *Rizzo*, 778 F.2d at 532. When considering this final factor, courts should "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Pratt*, 65 F.3d at 807 (*quoting Sandin v. Conner*, 515 U.S. 472, 482 (1995)). A plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for defendant's challenged conduct. *Pratt*, 65 F.3d at 806.

Defendants do not contend and the Court finds that there is no legitimate penological reason to "violently jab" a needle into an inmate's arm to intentionally cause pain.

As such, Mr. Braulick has established the existence of material fact regarding his claim of retaliation against Nurse Didier. Summary judgment will be denied on this claim.

## B. *Monell* Claims regarding Medications

Mr. Braulick's second claim is a *Monell* claim against CoreCivic based upon Mr. Braulick failing to timely receive thyroid medications on three occasions–June 2014, October 17-18, 2014, and October 31, 2014 - November 3, 2014.  In *Monell v. Dept. of Social Services of City of New York*, the United States Supreme Court, announced the following standard governing the liability of a municipality under 42 U.S.C. § 1983:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

436 U.S. 658, 694.  *Monell* involved a municipal corporation, but every circuit to consider the issue has extended the holding to private companies acting under color of state law such as CoreCivic.  *See Robinson v. City of San Bernardino Police Dept.*, 992 F.Supp. 1198, 1204 (C.D. Cal 1998) (*citing Street v. Corrections Corp. of America*, 102 F.3d 810, 817–18 (6th Cir. 1996)); *Harvey v. Harvey*, 949 F.2d 1127, 1129–30 (11th Cir. 1992); *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2nd Cir. 1990); *Lux v. Hansen*, 886 F.2d 1064, 1067 (8th Cir. 1989); *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th

Cir. 1982); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982).

As such, CoreCivic's liability under Section 1983 may not be predicated upon a respondeat superior theory of liability. *Monell*, 436 U.S. at 694. That is, Mr. Braulick cannot state a federal claim for relief against CoreCivic just because one of its employees may have violated his federal constitutional rights.

CoreCivic, however, "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. For CoreCivic to be liable, Mr. Braulick must establish "(1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy was the moving force behind the constitutional violation." *Miranda v. City of Cornelius*, 429 F.3d 858, 868 (9th Cir. 2005) (internal citations and quotations omitted).

Conclusory and generic allegations are insufficient to plead municipal liability under Monell. *See e.g., Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985) ("[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was

caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker"); *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir.2012) (allegations "that Defendants 'maintained or permitted an official policy, custom or practice of knowingly permitting the occurrence of the type of wrongs' that [plaintiff] elsewhere alleged" were insufficient where plaintiff "did not put forth additional facts regarding the specific nature of this alleged 'policy, custom, or practice' ").

Mr. Braulick contends that the policy he is referring to is that provided in the inmate handbook regarding pill call and KOP medications. He claims the policy states that KOP medications should be reordered when you have eight days of supply left. But, Mr. Braulick's eighth day fell on a non-KOP day so he could not order his medications in time to receive them on a timely basis. The Court finds that CoreCivic's policy advising inmate to reorder their KOP medications when they had an eight-day supply is constitutional. There is no evidence that Mr. Braulick could not have ordered prior to the exact day when he had an eight-day supply left.

Mr. Braulick does not relate the alleged failure to receive his medications on October 17-18, 2014 to a particular policy. Rather, he contends that it is the duty of the correctional officers to pack an inmate's property and separate the inmate's

KOP medications from their property and give them to medical staff so they can administer the medications to the inmate while he is in restrictive housing. He alleges though that sometimes a correctional officer would "accidently pack the inmates KPO meds along w/his property, i.e., not separate them to give to medical staff which would cause an inmate to not receive his meds for a few days." (Response, Doc. 51 at 22.) He claims that there could be flaws in the policy which would allow this to happen.

Mr. Braulick's burden is to demonstrate that CoreCivic's policy knowingly permitted the type of wrong alleged. The policy of having a correctional officer separate medications when an inmate is placed in restrictive housing, does not knowingly permit mistakes to be made. There is no evidence to establish that CoreCivic knew or should have known that this policy was so defective as to allow the "mistake" which presumably occurred in Mr. Braulick's case.

Mr. Braulick was also without his medications from October 31, 2014 through November 3, 2014 because of an apparent mix up regarding his prescription. Again, Mr. Braulick does not attribute this mix up to a particular policy of CoreCivic. Rather, it seems to be just that–a mix up. It does not rise to the level of a constitutional violation.

Summary judgment is also appropriate on Mr. Braulick's *Monell* claims.

Based upon the foregoing, the Court issues the following:

**ORDER**

1.  Defendant Didier's Motion for Summary Judgment (Doc. 39) is

DENIED.

2.  CoreCivic's Motion for Summary (Doc. 39) is GRANTED.  Count IV of

the Complaint is DISMISSED.

DATED this 10th day of October, 2019.


 */s/ John Johnston*
John Johnston
United States Magistrate Judge